# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SONNIEL R. GIDARISINGH,

        Plaintiff,

      v.                             Case No. 12-CV-455

WILLIAM POLLARD, PETE ERICKSEN,
MICHAEL DELVAUX, MARK LESATZ,
YANA PUSICH, formerly known as YANA ZANON[1],
WILLIAM D. SWIEKATOWSKI,
CHAD PRINCL, RON KELLY, and GARY LUNDE,

        Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 34), DENYING PLAINTIFF'S MOTION FOR PROTECTIVE ORDER (DOC. 74), AND DISMISSING THIS ACTION

This matter is before the court on defendants' motion for summary judgment and plaintiff's motion for a protective order sealing all filings. For the reasons set forth below, defendants' motion for summary judgment will be granted and plaintiff's motion for protective order will be denied.

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable

---

[1] Defendant Yana Zanon's name changed to Yana Pusich during the course of this case. (*See* Affidavit of Yana Pusich.) To avoid confusion, the court will refer to her as "Zanon Pusich" in this Decision and Order.

substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

FACTS[2]

A.     Parties and Claims

Plaintiff, a Wisconsin Department of Corrections (DOC) inmate, at all times relevant, was incarcerated at Green Bay Correctional Institution (GBCI). On the other hand, defendants were employed at GBCI at all relevant times, in the following capacities: William Pollard, warden; Peter Ericksen, security director; Captain Michael Delvaux, supervising officer 2; Captain Mark Lesatz, second shift commander; Captain Yana Zanon Pusich, supervising officer 2 since October 12, 2008, and previously supervising officer 1;

---

[2] Facts are taken from Defendants' Proposed Findings of Fact and Plaintiff's Response to Defendants' Proposed Findings of Fact.

2

Lieutenant William Swiekatowski, supervising officer; Correctional Officer Chad Princl; and Ron Kelly and Gary Lunde, social workers and disciplinary hearing inmate advocates.

This action stems from an October 29, 2007, incident during which another inmate allegedly attacked plaintiff. Plaintiff claims that: (1) Lesatz failed to protect him from gang violence by ignoring his Interview/Information Request form regarding threats from inmate Bradford Lewis; (2) Lesatz, Zanon Pusich, Delvaux, Ericksen, and Swiekatowski failed to investigate the assault on plaintiff; (3) Princl fabricated false disciplinary and criminal charges against plaintiff; (4) Lunde, Kelly, Swiekatowski, and Pollard found plaintiff guilty of the fabricated charges at a disciplinary hearing and denied plaintiff's request to present exculpatory evidence during the disciplinary hearing; (5) Zanon Pusich, Swiekatowski, Lesatz, Pollard, and Ericksen filed false charges in a conduct report and then punished plaintiff in retaliation for filing a grievance; (6) Pollard, Ericksen, Delvaux, Zanon Pusich, Lesatz, and Swiekatowski withheld and destroyed exculpatory evidence in a criminal case against plaintiff to secure a conviction; (7) Pollard failed to overturn disciplinary actions in Conduct Reports 1976989 and 1990487 despite knowledge of the above-described due process violations; and (8) Pollard and Swiekatowski destroyed plaintiff's legal documents in Case Number 07-CF-1275, thereby retaliating against him, and violating Wis. Stat. § 893.51. Plaintiff is proceeding on an Eighth Amendment claim of failure to protect, a Fourteenth Amendment claim that he was denied due process, and First Amendment claims that he was subjected to retaliation for exercising his free speech rights, as well as a supplemental state law claim.

Case 2:12-cv-00455-CNC   Filed 09/23/13   Page 3 of 34   Document 81

B.    DOC Policy

When a GBCI inmate wants to see a staff member, he may submit an Interview/Information Request form and place it in the appropriate mailbox. (Lesatz Aff. ¶ 7.) Alternatively, the inmate may hand the Interview/Information Request form to a staff member for delivery to the staff member to whom the form is directed. (Lesatz Aff. ¶ 8.) Inmates who are concerned for their personal safety may also submit a written request to the security director or security office for placement in protective confinement status pursuant to Wis. Admin. Code DOC 306.05. A Special Needs Placement (SPN) may be initiated when staff determine to house specific inmates in different institutions for safety and security reasons. For example, inmates often request SPNs due to gang affiliations and gang ties. (Lesatz Aff. ¶ 10.)

GBCI has a zero-tolerance policy towards unsanctioned group activities and gangs. (Lesatz Aff. ¶ 11.) Suppressing gang activity is imperative to maintaining a safe and secure institutional environment. (Lesatz Aff. ¶ 12.) The presence of gangs leads to the introduction and distribution of drugs, weapons, and other contraband and promotes intimidation, violence, and other criminal activities. (Lesatz Aff. ¶ 13.) Gangs undermine prison authority by providing a support system for those who oppose prison administration. (Lesatz Aff. ¶ 14.) GBCI has a disruptive group coordinator, who is responsible for identifying gang members, investigating gang activities and overseeing gang management strategies. (Lesatz Aff. ¶ 15.)

C.    October 29, 2007 Incident

Prior to the fight on October 29, 2007, Lesatz did not have any personal contact with plaintiff. (Lesatz Aff. ¶ 20.) He was not aware that any inmate had made gang-related

4

threats toward plaintiff before the altercation on that date. (Lesatz Aff. ¶ 31.) Moreover, Lesatz avers that he was not aware that plaintiff was involved in any gang-related activities at GBCI. (Lesatz Aff. ¶ 32.)

On the other hand, plaintiff avers that at 9:30 p.m. on October 28, 2007, he handed an Interview/Information Request form to Officer Coopman for delivery to Lesatz. In the form, plaintiff advised that inmate Bradford Lewis "was making threats to physical[ly] harm plaintiff with gang violence for allegedly plaintiff killed 2 of his gang brothers and that inmate Lewis spit in plaintiff['s] face and that plaintiff need security to intervene and protect plaintiff." (Gidarisingh Aff. ¶ 24.) Plaintiff believes that Lesatz received this communication on October 29, 2007, before inmate Lewis attacked him, and then conspired with Zanon Pusich, Delvaux, Ericksen, Pollard, and Swiekatowski to conceal the communication. (Gidarisingh Aff. ¶¶ 23-34.) However, as noted earlier, Lesatz states he was not alerted that plaintiff was involved in any gang related activity.

On October 29, 2007, plaintiff and inmate Lewis were housed in the South Cell Hall, in cell E-43 and cell E-49, respectively. (Gidarisingh Aff. ¶ 9.) At 8:00 p.m., plaintiff left his cell to obtain his depression medication from the nursing station in the Rotunda Hall. (Gidarisingh Aff. ¶ 39.) He accidentally forgot his prescription eyeglasses and, as a result, his vision was "very blurry." (Gidarisingh Aff. ¶¶ 40-41.) After taking his medication, plaintiff was returning to his cell when he saw a figure coming towards him. (Gidarisingh Aff. ¶ 42.) Plaintiff could not identify the figure until he was about three yards away and then realized that it was inmate Lewis. *Id.* Inmate Lewis, who was banging his right fist in his left open palm and staring at plaintiff, swung at plaintiff and began punching him. *Id.* Plaintiff swung

5

back in an attempt to get inmate Lewis and another inmate who had joined in, away from him. (Gidarisingh Aff. ¶ 43.)

At 8:15 p.m. on October 29, 2007, Lesatz responded to a radio call for assistance with a fight among inmates in the South Cell Hall. (Lesatz Aff. ¶¶ 18, 19.) Princl and Zanon Pusich also responded to a call for assistance related to the fight. (Princl Aff. ¶ 7; Schueler Aff. ¶ 7, Ex. 1003 at 1-2; Zanon Pusich Aff. ¶ 6.)

The fight consisted of two sets of two inmates fighting. Plaintiff and inmate Lewis made up one of the pairs, while the other two inmates separately fought each other. (Zanon Pusich Aff. ¶ 7.) Staff gave several direct orders to stop fighting, but plaintiff and inmate Lewis did not stop. (Zanon Pusich Aff. ¶ 8.) Plaintiff avers that he could not hear anything. (Gidarisingh Aff. ¶ 44.) Sergeant Troy Johnson attempted to separate plaintiff and Lewis. (Johnson Aff. ¶ 6; Francois Aff. ¶ 5, Ex. 1000 at 5-6.) Inmate Lewis appeared to comply with Johnson's order and covered himself for protection as the sergeant shielded him with his full body. Plaintiff continued to fight. (Johnson Aff. ¶ 7; Francois Aff. ¶ 5, Ex. 1000 at 5-6.) After ten to twenty seconds, Sergeant Johnson and Princl separated plaintiff and inmate Lewis, and Princl placed wrist restraints on plaintiff. (Princl Aff. ¶ 9; Schueler Aff. ¶ 7, Ex. 1003 at 1-2.) The parties dispute what happened next. Princl avers that as he was about to escort plaintiff, plaintiff pulled away and at the same time head-butted Princl in the face causing pain to the right side of Princl's nose. (Princl Aff. ¶ 10; Schueler Aff. ¶ 7, Ex. 1003 at 1-2.) Plaintiff denies that he head-butted Princl. (Gidarisingh Aff. ¶¶ 92-94.) Regardless, Princl and Sergeant Gleason directed plaintiff to the ground. Leg restraints were applied and plaintiff was escorted to the Health Services Unit for eye injuries he sustained during the fight. (Princl Aff. ¶ 11; Schueler Aff. ¶ 7, Ex. 1003 at 1-2.)

6

The inmates involved in the fight were placed in temporary lockup pending the outcome of Zanon Pusich's investigation to determine the extent of the fight, identify the inmates who were involved, and ensure that the conduct reports accurately reflected pertinent information. (Zanon Pusich Aff. ¶ 10.) Zanon Pusich had no reason to believe that this was a gang-related attack, and she had no prior knowledge that plaintiff felt threatened by other inmates in his housing unit, nor was she aware that plaintiff had contacted any other security staff complaining of gang-related threats. *Id.* Zanon Pusich believes that the incident was a fight among several inmates and that plaintiff refused direct orders to stop fighting and head-butted Officer Princl during the course of being restrained and escorted away from the fight. (Zanon Pusich Aff. ¶ 13.)

Plaintiff, on the other hand, believes that the fight was gang-related. He informed prison staff after the incident that he thought inmate Lewis attacked him for gang-related reasons. (Schueler Aff. ¶ 7, Ex. 1003 at 35; Francois Aff. ¶ 5, Ex. 1000 at 9-10.)

The incident was captured on GBCI's video-recording system. On October 31, 2007, Zanon Pusich reviewed the recording of the incident. She did not withhold or destroy the recording. However, the recording was not transferred to a disk and it was written over by the recording system. At the time of Zanon Pusich's review of the recording, she was not aware that it had not been transferred from the system to a disk. (Zanon Pusich Aff. ¶ 17) Lesatz was aware that the entire incident would have been caught on the housing unit's surveillance system and it was his responsibility to review the recording and transfer the incident to a disk. (Lesatz Aff. ¶ 41.) Lesatz inadvertently failed to transfer the incident to a disk. (Lesatz Aff. ¶ 42.)

7

After the fight, Zanon Pusich observed several lacerations to plaintiff's facial area, then plaintiff was taken to the Health Services Unit. (Zanon Pusich Aff. ¶ 18; Francois Aff. ¶ 5, Ex. 1000 at 11-12.) Plaintiff avers that Zanon Pusich took several photographs of his injuries on October 29, 2007. (Gidarisingh Aff. ¶ 51.) However, Zanon Pusich does not recall taking photographs of plaintiff's injuries. (Zanon Pusich Aff. ¶ 18; Francois Aff. ¶ 5, Ex. 1000 at 11-12.)

D.      Conduct Report 1976989

On November 1, 2007, Princl wrote Conduct Report 1976989 charging plaintiff with violations of DOC 303.13 (Battery) and 303.24 (Disobeying orders) based on the October 29, 2007, incident with inmate Lewis. (Schueler Aff. ¶ 7, Ex. 1003 at 1-2; Delvaux Aff. ¶ 4; Princl Aff. ¶ 13.) The conduct report states that plaintiff and inmate Lewis continued to strike each other with closed fists after several direct orders to stop fighting and that plaintiff injured Princl's nose and face, which required him to seek medical treatment. (Princl Aff. ¶¶ 14-15; Schueler Aff. ¶ 7, Ex. 1003 at 1-2.)

Delvaux reviewed Conduct Report 1976989 on November 2, 2007. (Ericksen Aff. ¶ 16; Delvaux Aff. ¶ 6; Schueler Aff. ¶ 7, Ex. 1003 at 1.) As reviewer, Delvaux had the authority to consider the appropriateness of the charges in the conduct report, dismiss the conduct report, strike any alleged rule violations if the statement of facts within the conduct report could not support a finding of guilty, and add any alleged rule violation if the statement of facts within the report could support a finding of guilty. (Delvaux Aff. ¶ 7.) Delvaux determined that Conduct Report 1976989 could proceed on the rule violations as alleged, and that the rule violations should proceed as major offenses under DOC 303.76. (Delvaux Aff. ¶ 10; Schueler Aff. ¶ 7, Ex. 1003 at 1.)

8

On November 6, 2007, a copy of the conduct report was given to plaintiff. (Delvaux Aff. ¶ 11; Swiekatowski Aff. ¶ 7; Schueler Aff. ¶ 7, Ex. 1003 at 1.) Plaintiff was advised of his disciplinary hearing rights, which were printed on form DOC-71, which reads in part "Notice of Major Disciplinary Hearing Rights and Waiver of Major Hearing and Waiver of Time." (Delvaux Aff. ¶ 12; Schueler Aff. ¶ 7, Ex. 1003 at 3-4.) Plaintiff signed the form certifying that he knew and understood his disciplinary rights. *Id.*

The DOC-71 form indicated that plaintiff's appointed staff advocate was Lunde. (Swiekatowski Aff. ¶ 8; Schueler Aff. ¶ 7, Ex. 1003, at 3.) However, Kelly was substituted as the advocate for plaintiff related to Conduct Report 1976989. (Lunde Aff. ¶ 11.) It was not unusual for staff advocates to be substituted by another advocate. (Lunde Aff. ¶ 12.) As an advocate for inmates in disciplinary hearings, Kelly makes initial contact with inmates served with conduct reports to address the alleged violations. (Kelly Aff. ¶ 9.) Kelly reviews the statements made by the author of the conduct report, reviews the Chapter DOC 303 rule cited as an alleged violation, and assists the inmate in understanding why the conduct report was written. If an inmate requests other evidence related to the charges, Kelly advises them to write on the witness form the specific evidence that is requested from security, such as videotape, photos, and correspondence. (Kelly Aff. ¶ 9.) Kelly also asks inmates if they request the presence of witnesses as inmates have the right to request the presence of witnesses at major violation hearings. (Kelly Aff. ¶ 10.) The witness request must be submitted on a witness form (DOC-73) directed to the security office and Kelly carries these forms with him when he makes initial contact with inmates who receive such conduct reports.

9

Kelly avers that on November 9, 2007, he went to plaintiff's cell and identified himself as the assigned staff advocate related to Conduct Report 1976989. He and plaintiff conversed for a short time and plaintiff stated that he did not request the presence of witnesses at his due process hearing. (Kelly Aff. ¶ 13.) Kelly completed an Advocate Interview Summary form and indicated that plaintiff did not request any witnesses. Kelly avers that he and plaintiff did not discuss any other evidence related to the fight on October 29, 2007. Kelly also avers that although plaintiff told him that he did not intend to call any witnesses at the disciplinary hearing, he could have changed his mind and requested a witness form from the housing unit staff. (Kelly Aff. ¶ 16.) Plaintiff denies that he had any interaction with Kelly prior to his disciplinary hearing. Moreover, he avers that Kelly did not come to his segregation cell on November 9, 2007. (Gidarisingh Aff. ¶ 118-21.) Plaintiff further avers that in November 2007, only an inmate's assigned advocate could give him a DOC-73 witness request form. (Gidarisingh Aff. ¶ 103.)

Swiekatowski conducted the disciplinary hearing related to Conduct Report 1976989 in accordance with the hearing procedures for major violations set forth in rule DOC 303.76. (Swiekatowski Aff. ¶ 15.) At plaintiff's November 15, 2007, disciplinary hearing, Kelly testified and advocated on behalf of plaintiff. (Kelly Aff. ¶ 17; Schueler Aff. ¶ 7, Ex. 1003 at 6.) Swiekatowski was not provided with a videotape of the incident, nor was he provided any photographs. (Swiekatowski Aff. ¶ 17.) Based on the statements made in the conduct report, plaintiff's written and verbal statements, and the advocate statement, Swiekatowski found plaintiff guilty of DOC 303.12 (Battery) and 303.24 (Disobeying orders). (Swiekatowski Aff. ¶ 16; Schueler Aff. ¶ 7, Ex. 1003 at 1-2, 6, 9-20.) He determined a disposition of 360 days in disciplinary separation and restitution for expenses incurred by

10

Princl due to the head-butt, which necessitated a visit to St. Vincent's Hospital. (Swiekatowski Aff. ¶ 18.) (As set forth earlier, plaintiff denies head-butting Princl.)

Any prisoner confined to a correctional institution or facility who intentionally causes bodily harm to a correctional officer without his or her consent is guilty of a felony. (Delvaux Aff. ¶ 19.) Therefore, on November 9, 2007, Delvaux forwarded a copy of Conduct Report 1976989 to the Brown County Sheriff's Department, which sent a referral to the Brown County District Attorney's Office for a possible charge of battery by a prisoner pursuant to Wisconsin Statute 940.20(1). (Delvaux Aff. ¶ 19; Francois Aff. ¶ 6, Ex. 1001 at 29-30.) Plaintiff was charged with battery in Brown County Case Number 07-CF-1275. However, on August 14, 2009, Brown County Circuit Judge Donald R. Zuidmulder granted Gidarisingh's motion to dismiss the charge. Judge Zuidmulder determined that the "video surveillance tape created of the incident and subsequently destroyed serves as sufficient exculpatory evidence to grant [Gidarisingh's] motion to dismiss" and that "the State failed to preserve evidence that is 'apparently exculpatory' and thus the due process test is failed." (Francois Aff. ¶ 6, Ex. 1001 at 20.)

E.     Inmate Complaint Review System: GBCI-2007-33363

On November 12, 2007, plaintiff filed Inmate Complaint GBCI-2007-33363 asserting that staff failed to protect him from the October 29, 2007, attack by inmate Lewis after he submitted a request slip to Lesatz advising that Lewis spit in his face and threatened him. (Zanon Pusich ¶ 22; Francois Aff. ¶ 7, Ex. 1002 at 1-7, 9.) In the offender complaint, plaintiff stated that he "address[ed] the request slip to G.B.C.I. Security Office, and stick the request slip in the bars of my cell door, at around 9:00 pm on 10-28-07, a unknown name

11

'red head' guard pick up the request slip at the 9:00 pm mail pick up…." (Lesatz Aff. ¶ 24; Francois Aff. ¶ 7, Ex. 1002 at 4-5.)

The Inmate Complaint Examiner (ICE) contacted Lesatz who indicated he had a communication from plaintiff after the fight. (Lesatz Aff. ¶ 26; Francois Aff. ¶ 7, Ex 1002 at 9.) Lesatz avers he does not recall receiving any communication from plaintiff related to concerns for his personal safety, and there is no such communication in the files maintained by the security office that refresh his memory. (Lesatz Aff. ¶ 27.)

F.    Conduct Report Number 1990487

According to defendants, on October 6, 2008, Zanon Pusich intercepted a letter written by plaintiff to Inmate Monzell Goodman. (Zanon Pusich Aff. ¶ 26; Francois Aff. ¶ 6, Ex. 1001 at 26-27.) Plaintiff avers that Zanon Pusich did not intercept the letter and that inmate Goodman sent the letter to Zanon Pusich to set up plaintiff. (Gidarisingh Aff. ¶ 161.)

In the letter, plaintiff (who refers to himself as "Jamaica") instructs inmate Goodman (referred to as "Money") on what to say at plaintiff's upcoming criminal trial in Brown County Case Number 07-CF-1275. (Zanon Pusich Aff. ¶ 27; Francois Aff. ¶ 6, Ex. 1001 at 26-27.) Plaintiff stated in the letter as follows: ". . . the guard Princl trying to say I let him handcuff me then I head butted him when he was escorting me from the cell hall. So I want you to definitely say that no restraint nor handcuff was placed on me until Princl slam Jamaica to the concret (sic) floor. Then Sgt. Gleason and Princl pick Jamaica up while Jamaica eyes was bleeding. It seem Jamaica couldn't see." (Zanon Pusich Aff. ¶ 28; Francois Aff. ¶ 6, Ex. 1001 at 27.)

Zanon Pusich believed that plaintiff was making a false written statement about Princl in his letter. (Zanon Pusich Aff. ¶ 29.) On October 16, 2008, she wrote Conduct

Report 1990487 charging plaintiff with a violation of DOC 303.271 (Lying about staff). (Zanon Pusich Aff. ¶ 30; Schueler Aff. ¶ 8, Ex. 1004 at 1-2.)

Zanon Pusich avers that she wrote Conduct Report 1990487 after conducting an investigation to assure that a violation occurred. (Zanon Pusich Aff. ¶ 31.) Plaintiff disputes this and avers that Zanon Pusich conspired to retaliate against him and fabricated Conduct Report 1990487 after she, Ericksen, Pollard, and Swiekatowski paid inmate Goodman to set up plaintiff. (Gidarisingh Aff. ¶¶ 167-75.)

On October 17, 2008, Ericksen reviewed Conduct Report 1990487 and determined that the alleged rule violation was appropriate. (Ericksen Aff. ¶ 23; Schueler Aff. ¶ 8, Ex. 1004 at 1.) That same day, a copy of Conduct Report 1990487 and form DOC-71, "Notice of Major Disciplinary Hearing Rights and Waiver of Major Hearing and Waiver of Time," were given to plaintiff. He refused to sign the DOC-71 and a correctional officer certified that he read the rights to plaintiff as printed on the form. (Swiekatowski Aff. ¶ 26; Schueler Aff. ¶ 8, Ex. 1004 at 4-5.)

On October 23, 2008, plaintiff submitted a "Request for Attendance of Witness," form DOC-73, and asked that Zanon Pusich and two inmates be called as witnesses at the disciplinary hearing. Swiekatowski reviewed the request for witnesses and did not allow the inmates to testify because he believed their testimony would not be relevant to the question of guilt or innocence. Swiekatowski approved Zanon Pusich as a witness, but he allowed her to provide a statement because disciplinary hearings are held during first shift hours and she works third shift. (Swiekatowski Aff. ¶ 27; Schueler Aff. ¶ 8, Ex. 1004 at 18.) On October 24, 2008, plaintiff submitted questions to be answered by Zanon Pusich, who provided written responses. (Swiekatowski Aff. ¶ 28; Schueler Aff. ¶ 8, Ex. 1004 at 6-13.)

13

Swiekatowski, who was the hearing officer at the October 30, 2008, disciplinary hearing, found plaintiff guilty of DOC 303.271 based on the statements in the conduct report, Zanon Pusich's testimony in the form of written questions and responses, and physical evidence as indicated on the "Disciplinary Hearing," form DOC-84. (Swiekatowski Aff. ¶¶ 31-32; Schueler Aff. ¶ 8, Ex. 1004 at 28.) Swiekatowski sentenced plaintiff to 360 days in disciplinary separation. (Swiekatowski Aff. ¶ 33.)

On November 3, 2008, plaintiff appealed the finding of guilty and the disposition. (Pollard Aff. ¶ 29; Schueler Aff. ¶ 8, Ex. 1004 at 30-41.) Pollard, who reviewed Conduct Report 1990487 and all relevant records, affirmed Swiekatowski's decision and disposition on November 21, 2008. He believed more likely than not that plaintiff wrote a letter to inmate Goodman asking him to lie about the actions of Princl related to criminal charges pending against plaintiff. (Pollard Aff. ¶ 30; Schueler Aff. ¶ 8, Ex. 1004 at 30.)

Plaintiff disputes this and avers that Pollard affirmed the decision and disposition in retaliation for plaintiff exposing him, Swiekatowski, Delvaux, Lesatz, Zanon Pusich and Ericksen to the state court, plaintiff's attorney, and the attorney's investigator. According to plaintiff, these defendants intentionally concealed and destroyed exculpatory evidence consisting of the videotape and photographs of plaintiff's injuries. (Defs.' Ex. 1004 at 18; Gidarisingh Aff. ¶¶ 178-84.) However, plaintiff failed to submit creditable, admissible evidence supporting his belief.

G.    Conduct Report Number 2193101

On August 25, 2010, Officer Stevens issued plaintiff Conduct Report 2193101, charging him with violations of DOC 303.24 (Disobeying orders) and 303.63 (Violations of institution policies and procedures). (Swiekatowski Aff. ¶ 41; Schueler Aff. ¶ 9, Ex. 1005

14

at 1-3.) In July 2010, plaintiff had received seven boxes of legal materials, which were sent to him from his former attorneys' office in Milwaukee, Wisconsin. Conduct Report 2193101 related to the confiscation of some of these legal materials, which were over the allowed limits, when plaintiff refused to comply with property rule limitations. (Swiekatowski Aff. ¶ 43.) All legal materials kept in an inmate's cell shall fit in a receptacle no larger than 20" x 20" x 20", or 8000 cubic inches.

Swiekatowski was the hearing officer at the disciplinary hearing related to the conduct report. (Swiekatowski Aff. ¶ 42; Schueler Aff. ¶ 9, Ex. 1005 at 1-3, 24-26.) On September 10, 2010, he found plaintiff guilty of 303.24 and 303.63, sentenced him to 120 days disciplinary separation, and ordered the disposal of the contraband (boxes of legal materials). (Swiekatowski Aff. ¶ 44; Schueler Aff. ¶ 9, Ex. 1005 at 24.)

Plaintiff filed an appeal and on October 8, 2010, Pollard reviewed Conduct Report 2193101 and all relevant records, and affirmed Swiekatowski's guilty finding, but he reduced the sentence to 60 days disciplinary separation. (Pollard Aff. ¶ 8; Schueler Aff. ¶ 9, Ex. 1005 at 6-16.) Pollard believed that plaintiff had the opportunity to go through his legal materials and come into compliance with institution rules prior to issuance of the conduct report. (Pollard Aff. ¶ 9; Schueler Aff. ¶ 9, Ex. 1005 at 6-16.)

When Pollard reviewed the disposition and sentence related to Conduct Report 2193101 in October 2010, he was not aware of any agreement between staff and the Attorney General's Office to retain plaintiff's legal materials that had been confiscated, and which led to the conduct report. (Pollard Aff. ¶ 10.) Lesatz had entered into an agreement with the Wisconsin Department of Justice to retain the legal materials at issue in Conduct Report 2193101 until further notice from the Attorney General's Office. (Pollard Aff. ¶ 11.)

15

Apparently, the agreement had not been communicated to all relevant GBCI staff. Pollard did not become aware of the agreement until after the legal materials were mistakenly destroyed, but he was aware that the Attorney General's Office contacted plaintiff's attorneys and that the DOC paid for copies of the destroyed documents. (Pollard Aff. ¶ 11.)

ANALYSIS

A.    Failure to Protect Claims

Defendants contend that plaintiff's failure to protect claim is subject to dismissal because they were not deliberately indifferent to a substantial risk of serious harm. They assert that plaintiff fails to establish that he was housed under conditions posing a substantial risk of serious harm because he fails to provide evidence that inmate Lewis had a propensity of violence or that it was highly probable Lewis would attack him. Defendants also contend that plaintiff's claim that Lesatz, Zanon Pusich, Delvaux, Ericksen, and Swiekatowski failed to investigate the assault on plaintiff cannot withstand scrutiny.

Plaintiff contends that Lesatz was deliberately indifferent to a substantial risk of serious harm to plaintiff's safety in that he failed to protect plaintiff from inmate Lewis, thereby resulting in Lewis attacking him on October 29, 2007. Plaintiff asserts that he has demonstrated that Lesatz received the Interview/Information Request form plaintiff handed to another guard on October 28, 2007, to give to Lesatz, in which he asserted that inmate Lewis had threatened him. Plaintiff also contends that Zanon Pusich, Delvaux, Pollard, Ericksen, Lesatz, and Swiekatowski knew that the attack on plaintiff was gang-related and failed to investigate the incident in order to shield themselves from civil liability.

Depriving a prisoner of "basic human needs like food, medical care, sanitation, and physical safety" violates the Eighth Amendment, but only if the defendant acted with

16

deliberate indifference to the prisoner's serious needs; negligence is not enough. *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013) (citing *James v. Milwaukee Cnty.*, 956 F.2d 696, 699-700 (7th Cir. 1992)). "A finding of deliberate indifference requires a showing that the [defendant] was aware of a substantial risk of serious injury to [the plaintiff] but nevertheless failed to take appropriate steps to protect him from a known danger." *Smith*, 715 F.3d at 191 (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)). The Eighth Amendment imposes upon prison officials a duty to protect inmates from violent assaults at the hands of fellow prisoners, but the duty is violated only by deliberate indifference to a known substantial risk. *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). Prison and jail officials "[are] not . . . required to guarantee the detainee's safety. The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Smith*, 715 F.3d at 191 (quoting *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000)). The deliberate indifference test therefore has objective and subjective prongs, the former requiring a grave risk and the latter requiring actual knowledge of that risk. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Once prison officials know about a serious risk of harm, they have an obligation "to take reasonable measures to abate it." *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

In this case, plaintiff submitted the Interview/Information Request form to a guard at 9:30 p.m. on October 28, 2007, for delivery to Lesatz. (The form stated that inmate Lewis "was making threats to physical[ly] harm plaintiff with gang violence for allegedly plaintiff killed 2 of his gang brothers and that inmate Lewis spit in plaintiff['s] face and that plaintiff

17

need security to intervene and protect plaintiff." (Gidarisingh Aff. ¶ 24.) The alleged attack took place at about 8:15 p.m. on October 29, 2007.

Defendants aver that Lesatz did not receive the form before plaintiff claims he was attacked. Plaintiff, on the other hand, avers that in July 2010, Lesatz "admit[ted]" to him that he received the communication before the attack but was too busy to come see him. (Gidarisingh Aff. ¶ 29.) However, for the reasons set forth below, this dispute is immaterial because even if Lesatz received the communication before the incident, his failure to respond immediately was not, under the circumstances, deliberately indifferent.

First, the court examines whether the communication advised Lesatz of a known substantial risk of harm. The substantial risk standard is high.

> [A] "substantial risk" could exist where prison officials place a [prisoner] in a cell in which "they know that there is a cobra there or at least there is a high probability of a cobra there." *Billman*, 56 F.3d at 788. Expanding upon this hypothetical, we found that, similarly, the assignment of a detainee without warning to a cell with an HIV positive inmate with a known "propensity" of raping his cell mates would also constitute a substantial risk. *Id.* In other cases, we have noted that "it is possible to state a claim on the basis of a guard's knowledge that a particular inmate poses a heightened risk of assault to the plaintiff." *Weiss*, 230 F.3d at 1032.
>
> When our cases speak of a "substantial risk" that makes a failure to take steps against it actionable under the Eighth or Fourteenth Amendment, they also have in mind risks attributable to [prisoners] with known "propensities" of violence toward a particular individual or class of individuals; to "highly probable" attacks; and to particular [prisoners] who pose a "heightened risk of assault to the plaintiff." Drawn from the particular pronouncements upon which the *Delgado* court formulated its general standard, these, too, are "risks so great that they are almost certain to materialize if nothing is done," and thus are themselves sufficient to establish a "substantial risk."

*Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005).

Plaintiff's communication to Lesatz asserted that inmate Lewis had threatened him with physical harm and "gang violence," that Lewis had spit at him, and that plaintiff needed

18

security to intervene to protect him. Based on this communication, Lesatz would be constitutionally required to investigate the situation and determine the risk of harm to plaintiff. *See id.* at 914. Thus, the issue is whether Lesatz's failure to conduct an investigation and intervene in the situation within twenty-three hours of receiving the form was deliberately indifferent.[3]

Prior to the October 28, 2007, communication and October 29, 2007, incident, Lesatz did not have any personal contact with plaintiff, was not aware of any gang-related threats from other inmates towards plaintiff, and was not aware that plaintiff was involved in any gang-related activities while residing in GBCI or otherwise. (Lesatz Aff ¶¶ 31-32.) Further, he was not aware of any written request submitted by plaintiff to the security director or security office for placement in protective confinement status. If Lesatz had become aware of gang-related threats to plaintiff, he would have conducted an investigation and made a determination as to the appropriateness of a Special Needs Placement, or alternatively, to separate and move one or more inmates to other housing units. (Lesatz Aff. ¶ 33.) According to Lesatz, he commonly receives complaints from inmates related to personal safety involving other inmates and he takes all such complaints seriously. (Lesatz Aff. ¶ 34.) Lesatz conducts investigations, in part, related to the complaints by interviewing inmates and security staff, observing inmates' behavior, and reviewing conduct reports.

Additionally, the record does not support a finding that inmate Lewis had a propensity for violence towards plaintiff prior to the communication and incident on October 28 and 29,

---

[3] Twenty-three hours passed between when plaintiff gave the form to the guard to give to Lesatz, and when the incident took place. It is not known when the guard actually gave the form to Lesatz, although it was presumably less than twenty-three hours before the incident. Because this timing is unknown, the court uses twenty-three hours as the benchmark.

19

2007. Moreover, Zanon Pusich's investigation did not uncover prior information that plaintiff felt threatened by inmates in his housing unit or that plaintiff had contacted security staff earlier complaining of gang-related threats. Finally, there is no indication that plaintiff had previously submitted a request to the security director complaining of a concern for his personal safety or that he requested a Special Needs Placement.

In addition to these factors, it is noteworthy that plaintiff voluntarily left his cell to obtain his medication on October 29, 2007. The court fails to see why he could not have requested an escort under the circumstances or simply elected to remain in his cell for the time being. Moreover, plaintiff forgot his glasses and therefore could not identify inmate Lewis until he was three yards away. If plaintiff had not forgotten his glasses, he could have identified inmate Lewis early enough to avoid him. In short, this situation was avoidable on the part of plaintiff and unpredictable on the part of prison staff.

Plaintiff points to his 1997 Milwaukee County conviction for first degree intentional homicide and first degree attempted homicide where the victims were two gang members as evidence that Lesatz and other GBCI officials should known he was at risk for gang violence. (Gidarisigh Aff. ¶¶ 18-19, Ex. 1.) He avers that the gang affiliation of the victims in his criminal case has been used against him at nearly every Program Review Classification hearing he has had over the last sixteen years. (Gidarisingh Aff. ¶ 20, Exs. 2, 2A, 2B.) Plaintiff further avers that the DOC used the fact that his victims were gang members to place him on administrative confinement status in 2003, 2004, and 2005. (Gidarisingh Aff. ¶ 21, Exs. 3, 3A, 3B.)

Although plaintiff has connections to gang members by virtue of his criminal case, the evidence does not demonstrate that those ties served to threaten his safety. Rather,

20

it appears that plaintiff's underlying crime was used as background information and to justify his secure confinement for the safety of others. For example, a Recommendation for Administrative Confinement from 2005 in which a staff member at Wisconsin Resource Center recommends that plaintiff again be reviewed for placement into administrative confinement states in part:

> Inmate Gidarisingh is being recommended for administrative confinement because there exists reasonable grounds to believe that his presence in general population poses a substantial risk of serious physical harm to both staff and inmates, as well as to the security of the institution.
>
> On 09/09/97 inmate Gidarisingh began his first period of incarceration. He is serving a life sentence of 42 years for first-degree intentional homicide and attempted first-degree intentional homicide. This incident involved Gidarisingh shooting two Vice Lord gang members.
>
> Since being received inmate Gidarisingh has developed a history of committing dangerous acts within the confines of a correctional institution. His violent behaviors entail fights with other inmates and batteries to both staff and other inmates. In addition, he has both threatened to cause serious physical harm to staff and the overall security of an institution by threatening to cause a riot when released to general population.
>
> . . .
>
> Following is a chronological listing of evidence that was utilized in justifying Gidarisingh's original placement in Administrative Confinement.
>
> 04/26/99 – While in segregation status inmate Gidarisingh received a conduct report for threats for stating to an officer, "Wait until I get out to population, there is going to be a riot."
>
> 05/17/99 – Gidarisingh received a disposition of 8 days adjustment and 360 days program for attempted battery and threats. This incident involved Gidarisingh striking an officer with his meal tray and then threatening to kill the officer by stating, "I'll kill you white boy."
>
> 02/18/00 – Gidarisingh received a disposition of 8 days adjustment and 180 days program for fighting with another inmate. A responding officer was transported to a local hospital for treatment for injuries he incurred while trying to break up the fight.

04/11/00 – Gidarisingh received a disposition of 5 days adjustment and 180 days program for disruptive conduct. While out in segregation Gidarisingh was observed spitting on another inmate.

04/10/01 – Gidarisingh received a disposition of 8 days adjustment and 360 days program for battery and possession, manufacture, and alteration of weapons. This incident involved Gidarisingh stabbing his cellmate numerous times with a pair of scissors until the handles eventually broke off.

05/30/02 – Gidarisingh received a disposition of 5 days adjustment and 240 days program for disruptive conduct. This incident involved Gidarisingh first becoming upset because the officer had given him juice during a meal. He then grabbed the officer's wrist and attempted to pull his arm through the trap.

06/18/02 – Gidarisingh received 5 days adjustment and 180 days program for threatening an officer by stating, "You better watch your back cause you're gonna slip and I'll be there to get you."

(Gidarisingh Aff. ¶ 21, Ex. 3B.)

To have acted with deliberate indifference, Lesatz must have known that failing to respond to plaintiff's Interview/Information Request form within one day of receiving it substantially threatened plaintiff's safety. *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008); *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). On this record, a reasonable fact-finder cannot conclude that Lesatz was deliberately indifferent. Lesatz's failure to contact plaintiff within twenty-three hours after receiving the Interview/Information Request form was, at most, negligence, although the court doubts that it even rises to that level. In any event, deliberate indifference requires more than a showing of negligent or even grossly negligent behavior. *Farmer*, 511 U.S. at 835; *James*, 956 F.2d at 699. Rather, Lesatz must have acted with the equivalent of criminal recklessness. *Farmer*, 511 U.S. at 836-37; *James*, 956 F.2d at 700. Here, even if Lesatz received the Interview/Information Request form before the incident, a reasonable fact-finder could not conclude that he was

deliberately indifferent to a serious risk of imminent harm based on his failure to personally respond to plaintiff within twenty-three hours.

Plaintiff asserts a failure to protect claim against Zanon Pusich, Delvaux, Pollard, Ericksen, Lesatz, and Swiekatowski based on their alleged failure to investigate the alleged attack of October 29, 2007, after it occurred. This claim is not supported because the record reveals that an investigation was conducted. In any event, whether defendants conducted an investigation after the incident has no bearing on plaintiff's failure to protect claim. Accordingly, plaintiff's failure to protect claim will be dismissed.

B.    Due Process Claims

1.    Procedural Due Process

Plaintiff contends that Princl, Zanon Pusich, Lesatz, Ericksen, and Delvaux conspired to file false charges against him in Conduct Report 1976989 to protect Lesatz from civil liability; that Lunde, Kelly, Swiekatowski, and Pollard denied him the chance to present witnesses in the disciplinary hearing concerning Conduct Report 1976989 where Swiekatowski was not impartial; that Princl, Delvaux, Ericksen, and Pollard forwarded a copy of Conduct Report 1976989 to the Brown County Sheriff's Department who referred it for false criminal charges of battery by a prisoner against plaintiff in Brown County Case 07-CF-1275; that Zanon Pusich, Ericksen, Pollard, and Swiekatowski violated his procedural due process rights and fabricated false disciplinary charges against him in Conduct Report 1990487; and that he suffered atypical and significant hardship in segregation after Zanon Pusich, Lesatz, Princl, Delvaux, Ericksen, Swiekatowski, Kelly, Lunde, and Pollard denied his due process rights as to Conduct Reports 1976989 and 1990487. Defendants contend

23

that plaintiff suffered no due process violations because their alleged actions were random and unauthorized, and because adequate post-deprivation remedies were available.

In analyzing a due process claim it must first be determined whether the defendants deprived the plaintiff of a protected liberty or property interest. Once it has been determined that a protected liberty interest or property interest is at stake, then the process which was due has to be identified. *Hamlin v. Vaudenberg*, 95 F.3d 580, 583 (7th Cir. 1996). However, an action for a denial of procedural due process will not lie if the state actor's conduct was random and unauthorized and if an adequate state remedy exists. *Zinermon v. Burch*, 494 U.S. 113, 128-32 (1990); *Hamlin*, 95 F.3d at 583.

Conduct is random and unauthorized if it is unpredictable. *Id.* Predictability is measured by the amount of discretion state procedures allow a state actor. *Id.* For example, if state procedures allow absolute discretion by state actors who hold disciplinary hearings, then it is predictable that those state actors may abuse their discretion, and a pre-deprivation process would be necessary. *Id.* When a deprivation is the result of a state actor's random and unauthorized conduct, the state cannot predict that such conduct will occur. As a result, it is futile or impossible for the state to guard against the deprivation by mandating additional pre-deprivation procedures. In this circumstance, "the State cannot be required constitutionally to do the impossible by providing pre-deprivation process." *Zinermon*, 494 U.S. at 129.

An adequate post-deprivation remedy cures the problem because the violation does not occur until the post-deprivation remedy is denied. In the context of procedural due process, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."

Case 2:12-cv-00455-CNC   Filed 09/23/13   Page 24 of 34   Document 81

*Zinermon*, 494 U.S. at 126. "A suit based on a wrongful act that ignores the existence of a post-deprivation remedy is, in effect, one that considers only partial or unfinished state action." *Morris v. McKeever*, 655 F. Supp. 388, 391 (W.D. Va. 1987). A state's action is not complete until and unless it provides or refuses to provide a suitable post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

A state remedy is adequate unless it can "readily be characterized as inadequate to the point that it is meaningless or nonexistent and, thus, in no way can be said to provide the due process relief guaranteed by the fourteenth amendment." *Easter House v. Felder*, 910 F.2d 1387, 1406 (7th Cir. 1990). Wisconsin has adequate post-deprivation proceedings for inmates wishing to challenge their disciplinary hearings. *Hamlin*, 95 F.3d at 585. For example, "Wisconsin prisoners may file a complaint with the state Corrections Complaint Examiner. Wis. Admin. Code. §§ 310.04(3), 310.09. In addition, the state law writ of certiorari is available to challenge actions of the disciplinary committee that violate state law. *Duenas v. Nagle*, 765 F. Supp. 1393, 1400 (W.D. Wis. 1991). Furthermore, prisoners may be able to bring state law tort claims against prison officials. *Scott v. McCaughtry*, 810 F. Supp. 1015, 1020 (E.D. Wis. 1992)." *Hamlin*, 95 F.3d at 585.

In this case, plaintiff was found guilty in Conduct Reports 1976989 and 1990487. He received a disposition of 360 days segregation in each conduct report. Assuming that these segregation stays implicated a liberty interest, *see Marion v. Columbia Correctional Inst.*, 559 F.3d 693, 698-99 (7th Cir. 2009), the next step is to determine what process was due. *Hamlin*, 95 F.3d at 583. However, the court need not reach this part of the analysis because defendants' conduct, as plaintiff alleges, was random and unauthorized. *Id.* Prison officials must follow the applicable procedures regarding disciplinary hearings, and

25

they lack the discretion to determine how to carry out these procedures. *Id.* Here, the alleged failure of defendants to follow state procedures was in spite of rather than because of state procedures. *Id.* Moreover, because the state cannot predict the kind of random, lawless conduct upon which plaintiff proceeds, a pre-deprivation proceeding would serve no purpose. *Id.* Therefore, because the conduct that plaintiff attributes to the defendants was random and unauthorized, and Wisconsin's post-deprivation proceedings are adequate to remedy any due process violations that may have occurred, plaintiff is unable to sustain his procedural due process claim. *Hamlin*, 95 F.3d at 584. Thus, defendants are entitled to summary judgment dismissing plaintiff's procedural due process claims.

2.      Substantive Due Process

Plaintiff maintains that Princl, Zanon Pusich, Lesatz, Ericksen, and Delvaux violated his substantive due process rights by conspiring to file false charges against him in Conduct Report 1976989 to protect Lesatz from civil liability. He also claims that Zanon Pusich, Ericksen, Pollard, and Swiekatowski violated his substantive due process rights and fabricated false disciplinary charges against him in Conduct Report 1990487.

The Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government action "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). Substantive due process claims have historically been related to matters involving marriage, family, procreation and the right to bodily integrity. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Id.* at 271-72.

26

Plaintiff cites to *Leslie v. Doyle*, 125 F.3d 1132 (7th Cir. 1997), in support of his substantive due process claims. In that case, the Court of Appeals for the Seventh Circuit opined that a claim against a prison official for knowingly making a false charge might best be analyzed under the principles of substantive, rather than procedural, due process. *Id.* at 1136-37. The appeals court suggested that "a useful approach is to say that a frame-up or malicious prosecution is in and of itself an inchoate breach of substantive due process, which matures into a viable claim if the consequences are sufficiently severe." *Id.* at 1137. Because the plaintiff in *Leslie* endured only fifteen days of confinement in segregation, the court concluded that his deprivation was not "atypical and significant" and, therefore, did not implicate a protectible liberty interest. Thus, in that case, even if the proper theory was substantive due process, the prisoner's allegations showed that there was no violation. *Id.*

Since *Leslie*, the Seventh Circuit has revisited the issue and stated that it is not convinced that *Leslie* provides the best framework for analyzing this type of claim. *See Lagerstrom v. Kingston*, 463 F.3d 621, 625 (7th Cir. 2006). The court of appeals explained:

> For one thing, the language [in *Leslie*] is *dictum*. We had no need to hold squarely that an independent substantive due process claim exists; instead, we said only that even if such a claim existed, Leslie would not be entitled to relief. *See id.* at 1137.
>
> Here, too, we have no need to resolve definitely where the line between conventional problems and a substantive due process violation lie, because ordinarily, "even assuming fraudulent conduct on the part of prison officials, the protection from such arbitrary action is found in the procedures mandated by due process." *McPherson*, 188 F.3d at 787; *see Hanrahan v. Lane*, 747 F.2d 1137, 1141 (7th Cir. 1984) ("We find that an allegation that a prison guard planted false evidence which implicates an inmate in a disciplinary infraction fails to state a claim for which relief can be granted where the procedural due process protections as required in *Wolff v. McDonnell* are provided."). *See also Newsome v. McCabe,* 256 F.3d 747, 751-52 (7th Cir. 2001) (holding that no federal constitutional claim-in particular none premised on substantive due process-exists for "malicious

27

> prosecution"). Of course, none of these cases is relevant to situations in which an inmate claims that a prison official trumped up a disciplinary charge in retaliation for the exercise of a constitutionally protected right. *See Black v. Lane,* 22 F.3d 1395, 1402-03 (7th Cir. 1994).

*Lagerstrom*, 463 F.3d at 625.

In this case, plaintiff's claims that defendants fabricated charges against him resulting in two 360-day segregation dispositions are claims for procedural due process violations. Moreover, to the extent that plaintiff's claim that the disciplinary hearing procedures themselves violated his constitutional rights, he also alleges that these actions were retaliatory. These claims, therefore, will be addressed under the First Amendment. *See Koutnik v. Brown*, 456 F.3d 777, 781 n.2 (7th Cir. 2006) (when a particular constitutional amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims). In light of the foregoing, defendants' motion for summary judgment as to plaintiff's substantive due process claims will be granted.

C.    Retaliation Claims

Plaintiff's retaliation claims are based on allegations that Swiekatowski and Pollard destroyed his legal documents in retaliation for the outcome of his criminal case, Brown County Case 07-CF-1275. Moreover, plaintiff asserts that Zanon Pusich, Ericksen, Pollard, and Swiekatowski fabricated false disciplinary charges against him in Conduct Report 1990487 in retaliation for him exercising his constitutional rights in Case 07-CF-1275. Additionally, plaintiff claims that Swiekatowski, Lunde, Kelly, and Pollard deprived him of

28

due process in the disciplinary hearing for Conduct Report 1976989 in retaliation for plaintiff filing GBCI-2007-33363.

To establish a prima facie case of retaliation, an inmate must produce evidence that (1) he engaged in constitutionally protected speech, (2) he suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (clarifying allocation of evidentiary burdens at summary judgment in light of *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011) (same). If the inmate satisfies these elements, the burden shifts to the defendants to rebut the causal inference with evidence showing that they would have taken the same action even without any retaliatory motive. *See Kidwell*, 679 F.3d at 965; *Greene*, 660 F.3d at 979.

Defendants first contend that plaintiff's claim that Swiekatowski and Pollard destroyed his legal documents in retaliation for the outcome of his criminal case must be dismissed because they did not act with a retaliatory motive. According to defendants, plaintiff cannot prove that the outcome of the criminal case was a substantial and motivating factor in these defendants' actions. In addition, the defendants submit that the alleged retaliatory action took place a year after the criminal case was dismissed.

Here, it is undisputed that plaintiff received seven boxes of legal materials from his former attorneys in July 2010 and that on August 25, 2010, Officer Stevens issued to plaintiff Conduct Report 2193101 charging him with violations of DOC 303.24 (Disobeying orders) and 303.63 (Violations of institution policies and procedures) after he refused to come into compliance with property rules limitations. On September 10, 2010, Swiekatowski found plaintiff guilty and ordered disposal of the contraband boxes of legal

29

materials. On appeal, Pollard affirmed the guilty finding and the order to dispose of the property. However, Lesatz had entered an agreement with the Wisconsin Department of Justice to retain plaintiff's legal materials until further notice from the Attorney General's Office. But, Swiekatowski and Pollard were unaware of this agreement when they ordered the destruction of plaintiff's legal materials. Pollard became aware of the agreement on November 20, 1010. Subsequently, the DOC paid for copies of the destroyed documents to be made and sent to plaintiff.

Plaintiff has not tendered any admissible evidence to the contrary which shows that the outcome of Brown County Case Number 07-CF-1275 had anything to do with the mistaken destruction of his legal materials in accordance with the disposition of Conduct Report 2193101. On the other hand, defendants have established that Delvaux sent Conduct Report 1976989 to the Brown County Sheriff's Department. Neither Zanon Pusich, Lesatz, Swiekatowski or Pollard was involved in the decision to refer the incident to the Brown County Sheriff's Department. Moreover, Case Number 07-CF-1275 was dismissed on August 14, 2009, and Swiekatowski did not order destruction of the property until over a year later. Accordingly, a reasonable fact-finder could not conclude that Swiekatowski and Pollard retaliated against plaintiff. *See Kidwell*, 679 F.3d at 965; *Greene*, 660 F.3d at 979.

Next, defendants contend that plaintiff's claim that Zanon Pusich, Swiekatowski, Lesatz, Pollard, and Ericksen retaliated against him with Conduct Report 1990487 after he exposed their alleged intentional withholding and destruction of exculpatory evidence regarding Brown County Case 07-CF-1275. The parties agree that there was a fight between plaintiff and inmate Lewis on October 29, 2007, and that Princl was injured during

30

that incident. Moreover, they agree that plaintiff wrote a letter to another inmate advising him what to say at plaintiff's upcoming criminal trial for battery against Princl. Zanon Pusich believed that plaintiff was making a false statement about Princl in the letter and on October 16, 2008, she issued Conduct Report 1990487 to plaintiff charging him with a violation of DOC 303.271 (Lying about staff). The videotape of the incident was destroyed and Brown County Circuit Judge Zuidmulder dismissed the criminal battery charge against plaintiff on that basis finding that the videotape was "apparently exculpatory." However, Judge Zuidmulder dismissed the charge on August 14, 2009, and Zanon Pusich filed Conduct Report 1990487 approximately ten months earlier, following receipt of plaintiff's letter to inmate Goodman. Moreover, the evidence shows that Lesatz inadvertently failed to copy the videotape to a disk and the footage was written over by the DOC system. As a consequence, the record does not support a finding that plaintiff's actions defending himself in Case Number 07-CF-1275 were a substantial or motivating factor in Zanon Pusich's decision to issue him Conduct Report 1990487 and Swiekatowski, Lesatz, Pollard, and Ericksen's actions surrounding the conduct report. Hence, plaintiff's retaliation claim regarding the destruction of his legal materials cannot be sustained and warrant dismissal on defendant's motion for summary judgment. *See Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); *Burks v. Wis. Dep't of Trans.*, 464 F.3d 744, 758-59 (7th Cir. 2006)

Finally, plaintiff claims that Swiekatowski, Lunde, Kelly, and Pollard conspired to retaliate against him regarding the disciplinary hearing in Conduct Report 1976989 because he filed GBCI-2007-33363. Plaintiff filed the subject inmate complaint on November 12, 2007, three days before his disciplinary hearing. He avers that Swiekatowski conspired to retaliate against him for filing Offender Complaint GBCI-2007-33363, prevented him from

31

calling witnesses and presenting exculpatory evidence, and added false written statements to the disciplinary record to give the illusion that he made those verbal statements. Plaintiff further avers that Swiekatowski was biased, found him guilty without evidence to support the decision, and failed to conduct the hearing in accordance with Wis. Admin. Code § DOC 303.76. (Gidarisingh Aff. ¶¶ 117-128, 134, 135, 138-141.)

Here, plaintiff received Conduct Report 1976989 before he filed GBCI-2007-33363 and, therefore, the disciplinary process began before plaintiff filed his inmate complaint. As an initial matter, there is no indication that Lunde, Kelly, and Swiekatowski knew before the hearing that plaintiff had filed the inmate complaint. (Swiekatowski Aff. ¶ 37; Delvaux Aff. ¶ 30.) Even if they knew, the record establishes that Lunde, although initially assigned as plaintiff's advocate, was substituted by Kelly, who advocated for plaintiff at the disciplinary hearing. Swiekatowski conducted the hearing and found plaintiff guilty based on the statements made in the conduct report, plaintiff's written and verbal statements, and the advocate statement. The purpose of the Inmate Complaint Review System is to encourage communication between inmates and staff and to correct any errors or deficiencies in correctional policy through questioning and review. (Pollard Aff. ¶ 33.) Pollard and Swiekatowski encourage inmates to use the Inmate Complaint Review System and would not discourage or punish Gidarisingh, or any inmate, for using the grievance system. (Pollard Aff. ¶ 33; Swiekatowski Aff. ¶ 37.)

Plaintiff does not offer specific facts that refute defendants' averments and establish that Lunde, Kelly, Swiekatowski, or Pollard retaliated against him for filing GBCI-2007-33363. Conspicuously absent is any evidence of statements attributable to defendants that indicate that they individually or collectively reacted to plaintiff's defense in Case Number

32

07-CF-1275. As such, his claim that they conspired to retaliate against him regarding his disciplinary hearing will be dismissed. *See Kidwell*, 679 F.3d at 965; *see also* Fed. R. Civ. P. 56(c)(1).

D.    State Law Claim

Plaintiff's state law claim is based on allegations that Pollard and Swiekatowski destroyed his legal documents in violation of Wis. Stat. § 893.51, which provides an action to recover damages for the wrongful taking, conversion, or detention of personal property. The record shows that plaintiff's legal files were erroneously or mistakenly destroyed, but soon after recopied and restored to him at DOC expense. Plaintiff has not shown how his state law claim can proceed in light of these factual findings. Thus, the claim will be dismissed.

PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

Plaintiff has filed a motion for protective order pursuant to Federal Rule of Civil Procedure 5.2(d) and (e). He asserts that the information in this case related to gang violence will place him at a substantial risk of serious harm and requests that the court seal all filings and decisions. Defendants do not oppose the motion.

"It is beyond dispute that most documents filed in court are presumptively open to the public[.]" *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009). The property and privacy interests of the litigants can be overridden only if they predominate in a particular case, that is, only if there is good cause for sealing a part or the whole of the record. *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999) (citation omitted). The good cause determination "cannot be elided by allowing the

33

parties to seal whatever they want, for then the interest in publicity will go unprotected unless the media are interested in the case and move to unseal." *Id.*

Here, plaintiff seeks to seal this entire case and he has not shown good cause to do so. Moreover, he has not complied with the Local Rules. *See* Civil L.R. 79(d) (E.D. Wis.). Therefore,

IT IS ORDERED that defendants' motion for summary judgment (Doc. 34) is GRANTED.

IT IS FURTHER ORDERED that plaintiff's motion for protective order (Doc. 74) is DENIED.

IT IS FURTHER ORDERED that this action is dismissed.

Dated at Milwaukee, Wisconsin, this 23rd day of September, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. District Judge

34